AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>Zheng Zhang,<br><br>Defendant(s) | Case No. 3 19 71457 JCS<br><br>**UNDER SEAL** (crossed out) |

FILED
SEP - 4 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **November 17, 2017** in the county of **San Francisco** in the **Northern** District of **California**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:
Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form: /s/

WILLIAM FRENTZEN
Assistant United States Attorney

*Complainant's signature*

Janette Spring, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 9/3/19

*Judge's signature*

City and state: San Francisco, California    Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
*Printed name and title*

1-MJS

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

**I.  INTRODUCTION**

**A. SYNOPSIS**

1. I submit this affidavit in support of a criminal Complaint for Dr. Zheng ZHANG ("ZHANG").

2. There is probable cause to believe ZHANG engaged in a scheme to commit Medicare fraud by receiving cash kickback payments in exchange for the referral of home healthcare patients in violation of 42 U.S.C. §1320a-7b(b), the anti-kickback statute.

3. As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential human source ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE"):

4. An identified co-conspirator introduced ZHANG to CW-1 and UCE as an individual willing to accept kickbacks in exchange for the referral of patients.

5. During the course of the investigation, UCE held multiple in-person audio and video recorded conversations with ZHANG, in 2017 and 2018, in which ZHANG received kickback payments in the form of cash in exchange for the referral of home health and/or hospice patients.

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

## B. BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION

6. Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

7. An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

2

bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments

8. Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

9. In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

10. In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.[5] During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C. AGENT QUALIFICATIONS

11. I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12. In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b.

13. This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D. COMPLAINANT

14. Dr. Zheng ZHANG, is a 62 year old physician with a medical practice in San Jose, CA and residing in Saratoga, CA. During the course of the investigation, ZHANG accepted kickbacks from an FBI UCE in exchange for patient referrals.

### E. STATUTES VIOLATED

15. **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II. PROBABLE CAUSE

### A. ZHANG IS INTRODUCED TO UCE BY A CO-CONSPIRATOR

16. In January 2017, CW-1 identified Mervina DEGUZMAN ("DEGUZMAN") as a nurse engaged in kickback schemes.

17. Because of DEGUZMAN's position as a nurse, DEGUZMAN had numerous relationships with physicians in the San Jose, CA area, including ZHANG. DEGUZMAN used her connections to engage in a kickback scheme that would direct patients to certain facilities in exchange for cash.

18. The UCO initially focused on DEGUZMAN and individuals believed to be accepting kickbacks from her. ZHANG was later introduced to CW-1 and UCE by DEGUZMAN.

19. On May 15, 2017, CW-1 and UCE recorded a meeting with DEGUZMAN and her acquaintance, ("CO-CONSPIRATOR 1")[6], to propose a business partnership. During the meeting, CW-1 explained s/he and a business partner (UCE) would be purchasing HHA Alpha and were looking to increase the patient population prior to the purchase. As part of their agreement,

---

[6] Throughout this affidavit the names of co-conspirators not charged during this investigation have been redacted.

DEGUZMAN would introduce CW-1 and UCE to individuals willing to steer patients to HHA Alpha in exchange for kickbacks. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | Especially if we're willing to pay, if you know what, as you said you know what the relationships are now, and if we add another 50 to that, 100 to that, they'll be like "yea I'll break you off a little". Does that sound fair? |
| DEGUZMAN: | Yeah. |
| UCE: | Ok. So that's what we looking for. And…so, I'd be…I don't want you to have to drive everywhere under the sun. But I definitely need your help to burst through the door. |
| DEGUZMAN: | Ok. |

20. On or about November 6, 2017, CW-1 contacted DEGUZMAN on her cellular telephone and recorded their discussion about an upcoming meeting with another physician ("Doctor 1")[7]. During the call, DEGUZMAN advised CW-1 how to draft a fraudulent consulting contract with Doctor 1 and acknowledged that paying for patient referrals was illegal, stating "So so so but in the mean time you can say that you can do a contractual, contractual work, like her work, her paid work is based on caseload, but it's it's the politically correct way to say, you know? They're not paid patients, but you know you cannot pay for a patient, cause it's illegal, but then you can pay for labor."

21. On or about November 15, 2017, DEGUZUMAN placed a call to CW-1, during which the discussed DEGUZMAN's influence with ZHANG. During their conversation, CW-1 offered to compensate DEGUZMAN for an introduction to ZHANG. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| DEGUZMAN: | So after Tam [NGUYEN] quit that hospitals Zhang became king. It use to be him but no more. Now Zhang is king. Zhang is the one. And he's funny. So anybody that goes to him as a vender, out of fun, introduce vendors to him right? Out of fun because we know he's not going to deal with them. Um and they ask him questions and you know what he tells them? |
| CW-1: | Talk to Mervina? |

---

[7] Throughout this affidavit the names of physicians not charged during this investigation have been redacted.

|               | *laughter* |
|---|---|
| DEGUZMAN: | Yes! In front of me. I say Dr. Zhang this is very embarrassing please don't say that in front of me…I say tell them secretly and he says 'but it's up to you" |
|  | … |
| CW-1: | We're fixing so much damage that she has done but we've overcome so much off it. But we just have to do it the right way. And again, any connection, I'm sure I already told you. If you introduced us you get the referral fee— |
| DEGUZMAN: | He's still good but Zhang is now the bigger. Because he quit. |
| CW-1: | Oh so we do Zhang we get the referral fee for that too. The 30% that you get hopefully. |

22. On or about November 13, 2017, DEGUZMAN placed a call to CW-1 to discuss connecting CW-1 with ZHANG. During the call, DEGUZMAN explained how ZHANG should be paid for patient referrals. Below is an excerpt of the aforementioned exchange:

| DEGUZMAN: | With Dr. Zhang I just finished talking with him just now. |
|---|---|
| CW-1: | Ok. |
|  | … |
| DEGUZMAN: | So what I wanted to umm ask from you is because he thinks in his mind hospice is a different price than home health. |
| DEGUZMAN: | And then they increase in price, this is how you motivate doctors to give more. |
| CW-1: | We want to stay within five and see how it works. |
| DEGUZMAN: | Right. |
| CW-1: | We don't want to change the number way up high. |
| DEGUZMAN: | Oh ok. |
| CW-1: | So what what... |
| DEGUZMAN: | So for for home health it's $400. |
| CW-1: | Ok that's doable no problem. |

8

| | | |
|---|---|---|
| DEGUZMAN: | | Yeah. |
| CW-1: | | And then what about hospice. |
| DEGUZMAN: | | And then for hospice umm what they do, is they, of course they have to, not be dead the next day. |
| CW-1: | | Right right. |
| DEGUZMAN: | | Right, so the referral, the average is $750, average. |

....

| | | |
|---|---|---|
| DEGZUMAN: | | So if he refers today I want him to get compensated for his referral. |
| CW-1: | | On Friday we'll do it no problem. |
| DEGUZMAN: | | Yeah so I will tell him ok. |

23. On or about November 17, 2017, DEGUZMAN arranged a dinner in San Jose, CA for ZHANG, CW-1, and UCE. During the dinner and in the presence of DEGUZMAN, UCE offered to pay ZHANG for patient referrals and negotiated the price of each referral. Below is an excerpt of the aforementioned exchange:

| | | |
|---|---|---|
| UCE: | | We'll give you 750 for the hospice patients. If it [the patient care] lasts more than a month [unintelligible] we'll pay you 20% more, which is one-fifty for the next month. Does that, does that [unintelligible] your expectations? |

...

| | | |
|---|---|---|
| UCE: | | If these numbers don't make sense to you based on other relationships you have please tell me. We don't…we don't want you to be dissatisfied and you know lose interest. We'd rather match what our competitors are paying and keep you engaged so are these numbers ok [unintelligible]? |
| ZHANG: | | Yes. |

### D. ZHANG ACCEPTS KICKBACK IN EXCHANGE FOR THE REFERRAL OF MEDICARE PATIENTS

24. At the conclusion of dinner, UCE presented an envelope containing $1,000 cash to ZHANG as a good faith payment to begin their arrangement. ZHANG accepted the envelope, which

9

UCE understood to be ZHANG's acceptance of the terms discussed during the dinner. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | So uhh doctor uhh...I think we have a good agreement you know this entire relationship is based on faith so uhh I have an envelope with a thousand dollars. It's a down payment because this entire relationship is based on faith and we trust we have a good relationship. |
| ZHANG: | Alright. |
| UCE: | Ok? |
| ZHANG: | Thank you. |

25. On the following day, on or about November 18, 2017, ZHANG sent a text message to UCE and CW-1 advising that he was sending a patient referral, "Ref ["Patient 1"][8] for hhc [home health care] going home today" and "Need fax number to send". A review of Patient 1's paperwork determined Patient 1 to be a Medicare beneficiary.

26. During a meeting on March 28, 2018, DEGUZMAN inquired if ZHANG was still participating in the scheme. UCE explained s/he had not heard from ZHANG in a while. DEGUZMAN advised ZHANG was the type of physician who needed a "push" and offered to speak to ZHANG on UCE's behalf.

27. On or about May 4, 2018, DEGUZMAN sent a group text to CW-1 and UCE explaining why ZHANG had not referred any additional patients to HHA Alpha, "Hi! I had dinner with Dr Z [ZHANG] the other night...he mentioned the reason he hasn't sent is becuz after the first one he sent, he never heard from you guys. Told him I'm sure it was just overlooked." In her text message, DEGUZMAN indicated that ZHANG did not view the "good faith" payment as payment for the patient and was waiting for an additional payment before referring more patients to HHA Alpha. UCE offered to correct the misunderstanding, responding to DEGUZMAN "Wow, we prepaid him for the first one. Total misunderstanding. I will fix it."

---

[8] Throughout this affidavit, I have removed patients' names to protect their privacy, and have referred to them instead as "Patient 1," "Patient 2," etc

10

28. On May 25, 2018, UCE recorded a meeting with ZHANG at his office in San Jose, CA. During their meeting, UCE apologized for their misunderstanding and offered to pay ZHANG $400 for the referral of Patient 1. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | Ah, I appreciate you taking the time to meet me, um, I apologize. I think there was a misunderstanding between the two of us, um, ah, so ah, it was only when Mervina [DEGUZMAN] explained to me that.... |
| ZHANG: | Mmhmm. |
| UCE: | So when we met the first time.... Ah, the thousand dollars I gave you outside the ah, the ah restaurant ah she, I thought that when you were sending that patient that that was counting of part of that thousand dollars, but then Mervina explained to me that yeah, that was separate so ah, ah, you know and our (UI) the customer is always right, so, um, this is the four hundred dollars... Of that, ah, I apologize for any misunderstanding |
| ZHANG: | No big deal. |

29. During the same meeting, UCE explained HHA Alpha was no longer accepting patients but UCE was willing to pay ZHANG $1,000 cash per month to keep ZHANG engaged in their scheme. In exchange for the $1,000, UCE asked that ZHANG continue to refer patients to UCE at a later date. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | we want to maintain a good relationship with the doctors and we want on, when October starts that they were able to send us patients. So we are doing a program where we ask people just to give them a monthly retainer of a thousand dollars and ask them just to be patient with us until October. And when October comes, they just agree to stay with us and provides us patients. Is that? Does that sound something that's fair to you? |
| ZHANG: | Sure. |
| UCE: | Okay, alright. Um, so, with to that end I have....here... That's a thousand dollars for this month. |
| ZHANG: | Okay, thank you. |

30. On August 8, 2018, UCE recorded another meeting with ZHANG at his office in San

Jose, CA. During their meeting, UCE re-affirmed ZHANG was still willing to participate in the kickback scheme. UCE offered ZHANG another $1,000 cash in exchange for the agreement that ZHANG would refer patients to HHA Alpha at a later date. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | We hoping-hoping October but yes so um and as long as you're willing to still work with us and give us patients when time comes, happy to, happy to keep working with you. |
| ZHANG: | Sure. |
| UCE: | Perfect, all right thank you. Do you have any questions or concerns? |
| ZHANG: | No. |
| UCE: | All right, perfect so this the thousand as normal. |
| ZHANG: | Okay. |

31. During the course of the UCO, ZHANG met with UCE on three more occasions. During each of the first two meetings, ZHANG accepted $1,000 cash from UCE per their on-going agreement. During the third meeting on November 5, 2018, ZHANG and UCE discussed the recent FBI investigation into another home health agency. In light of the investigation, ZHANG and UCE discussed the need to be careful and ZHANG suggested they take a "break" from their arrangement. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | But I just wanna the only reason I'm here is just to maintain our relationship but absolutely if there's any risk that you feel like you wanna keep it quiet, absolutely it's up to you. |
| ZHANG: | Yeah I think I think we probably take a little break and… |
| UCE: | Okay. |
| ZHANG: | …and see what happens. |
| UCE: | Okay that's absolutely fine with me um do eh do you want me to when we get our company back or when we get our company sorry… |
| ZHANG: | Mmhmm. |

| | |
|---|---|
| UCE: | ...should say uh do you want me to come back and see how you feel? |
| ZHANG: | Yeah. |

## III.  PROBABLE CAUSE FOR THE VIOLATION

### A.  TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(1)(A), THE ANTI-KICK BACK STATUTE

32. Title 42, United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

33. Based on all of the foregoing, probable cause exists to believe ZHANG accepted kickback payments from an FBI UCE that were intended to induce ZHANG to refer patients to HHA Alpha for home health and/or hospice services later billed to Medicare.

34. Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by ZHANG for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

35. Therefore, there is probable cause to believe that patient referrals sent to HHA Alpha by ZHANG in exchange for cash payment from UCE meets the definition of a kickback payment and violates anti-kickback statute.

## IV.  CONCLUSION

36. Based on the foregoing, there is probable cause to believe ZHANG conspired to receive kickbacks in exchange for patient referrals in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

## V.  REQUEST FOR SEALING

37. Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or

this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect. Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

_____
Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 3rd day of September, 2019.

_____
HON. JOSEPH C. SPERO
United States Chief Magistrate Judge

14